RYAN WILLIAM LOCKHART,     )
                                  )
          Plaintiff,           )
                                  )
     v.                           )     2:20cv258
                                  )     **Electronic Filing**
ENERGY TRANSFER PARTNERS, LP, )
                                  )
          Defendant.     )

## OPINION

Ryan William Lockhart ("plaintiff") commenced this employment discrimination action against Energy Transfer Partners, LP ("defendant"). Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion will be denied.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record

evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" ... "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment.").  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993)

(although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Prior to October of 2016 plaintiff was living and working in North Carolina. He was contacted by Alan Roden who was then a supervisor at defendant's facility in Export, Pennsylvania, and made aware of a job opening at the facility. Plaintiff and Roden had served in the Marines together in Iraq as part of Operation Desert Storm and were in the same platoon. Plaintiff suffered post traumatic stress disorder after his tour of duty and had struggled with substance abuse.

Plaintiff perceived the potential for employment in Pennsylvania as a new opportunity to change his life, get a new start in a new place, and to put his past behind him. He applied for the position and was hired by a subsidiary of defendant as a warehouseman. He moved to Export, Pennsylvania, to start the new job in October of 2016. Roden left his employment with defendant shortly before plaintiff started his new position.

Plaintiff reported directly to Anthony Smith, who was the supervisor in charge of the Export facility. Smith promoted plaintiff to a purchasing coordinator in April of 2017. In August of 2017, Smith disciplined plaintiff for repeated failures to process purchase orders properly.

As part of his efforts toward starting a new segment of his life, plaintiff underwent a phase of personal transition where he explored various religions before permanently converting to Judaism. Since he started working with ETO, plaintiff adheres primarily to Judaism.

Smith received emails in November of 2017 raising complaints about plaintiff's conduct in the workplace. Two of plaintiff's co-workers complained that plaintiff had moved a desk from

3

his office into another office so that a new employee would have a workplace outside plaintiff's office. Co-worker Christopher Cerro complained that plaintiff seemed to have a superiority complex, often isolated himself, and was short tempered and disrespectful.

Co-worker Stephen Guaden likewise complained to Smith that plaintiff often ignored him and was rude at times. Guaden felt that plaintiff wasn't a team player and lacked a level of professionalism at times.

Cerro forwarded his email to another co-worker, Karen Saville, when he sent it to Smith. Saville also sent an email to Smith complaining that plaintiff had moved a desk as part of an office rearrangement to make room for a new employee. She further indicated that plaintiff was complaining and isolating after office lighting was restored, but then also often invaded other co-worker's space, making it difficult to work with him.

Saville's complaint came three days after she received Cerro's email to Smith. Smith replied to Cerro's email by saying *"Thank You!!"* and to Saville's by replying "Thank you." Smith did not forward the emails to headquarters.

Smith raised only the desk incident with plaintiff. Plaintiff had received direction from a safety representative who instructed plaintiff to move the desk. This was done because the new safety employee would need his own office and the safety representative intended to set up another office to accommodate the needs of the new employee.

Defendant had an anti-harassment policy that was summarized in its employee handbook. Plaintiff received a copy of the 2016 version of the handbook at the time of his hire and acknowledged receiving a copy at that time. He did not familiarize himself with its contents. Plaintiff was not aware of defendant's anti-harassment, anti-retaliation and reporting polices regarding workplace incidents for at least thirteen months of his employment.

4

On December 5, 2016, company officials highlighted that plaintiff had not completed a number of required "new employee" training sessions. These included cybersecurity, social media use, market manipulation and workplace harassment. Smith was made aware of the situation. Plaintiff first completed market manipulation training in December of 2016 and then completed a number of the other trainings in April and May of 2017. Nevertheless, plaintiff was not required to undergo workplace anti-harassment training and did not do so until over a year later.

On December 7, 2017, plaintiff completed defendant's 2017 workplace harassment training. The training enlightened plaintiff about the nature of the policy and the alternative avenues for reporting workplace harassment.

Directly following the training plaintiff filed an internal complaint of harassment against Smith in defendant's EthicsPoint System. In his complaint, plaintiff reported that Smith had "repeatedly" subjected him to "inappropriate physical contact and bodily intimidation as well as psychological/verbal intimidation"; repeatedly slapped him on the buttocks after being told to stop; blocked plaintiff's path while working and violated his personal space while plaintiff was "trapped" at his desk; on one occasion pulled plaintiff's hair out with pliers; persistently made "derogatory remarks," calling plaintiff names like faggot and making "obscene sexual gestures" at plaintiff; "and intimidated [him] with comments pertaining to [his] religion." Plaintiff indicated that the cumulative effect of this campaign had terrified him because he couldn't think when Smith was around and he was afraid of what Smith might do next.

Plaintiff further indicated that the incidents had all happened at the Export warehouse and mostly in plaintiff's office. The conduct had been ongoing for "over a year" and recent examples of what he perceived to be inappropriate treatment included Smith commenting about plaintiff's

body and how he would "fit in company shirts" and slapping his buttocks inappropriately as he walked past. He also engaged in verbal intimidation and blocked him in a way that confined him to his desk. Plaintiff relayed that "I don't want to involve others in the office[,] I just want this abuse to stop."

Human Resources director Naomi Manno investigated plaintiff's complaint. She traveled from Texas to Export on December 12, 2017, and began interviewing office personnel on December 13, 2017. She interviewed plaintiff, Smith, Cerro, Saville and Gauden as part of her investigation.

During his interview with Manno, plaintiff reiterated much of his initial complaint. He provided details and added that Smith often mocked him by singing the lyrics of "you're so fine, you're so fine you blow my mind" and inserting plaintiff's name into the lyrics at the beginning. Smith would invade his personal space when tutoring him about work and stick his finger in plaintiff's ear. He would block plaintiff at his desk and slap him on the butt. Whenever plaintiff confronted him about these behaviors, Smith would ask "who pissed in your pot" and then become more angry as the day unfolded. Smith's level of verbal and physical intimidation would likewise increase.

Plaintiff also provided additional information about having his hair pulled with pliers. Around February or March of 2017, plaintiff and Smith were talking and the conversation verd into religion. As the conversation unfolded Smith took the pliers, gripped plaintiff's hair on the left side of his head and pulled until the hair let loose. Plaintiff told Smith God was going to punish him.

Plaintiff then elaborated that Smith often argued with plaintiff about his conversion to Judaism. In one conversation Smith quipped that "those Jews learned their lesson in the

Holocaust." The statement struck fear in plaintiff, destroyed his trust in Smith and thereafter whenever Smith brought up religion plaintiff tried to avoid the topic by trying to change the subject.

Plaintiff explained that Smith frequently called him a faggot. After plaintiff started taking swing dance classes in July, Smith found out about it. Smith questioned why plaintiff would want to do that and started mocking plaintiff by dancing around and thrusting his pelvis around while saying "look at me dancing."

Plaintiff indicated that he had asked Smith to stop on a number of occasions, but Smith would just get angry or retort in a way that made plaintiff look as if he were the problem. Plaintiff did not report the conduct earlier because he really needed the job and he was concerned about losing it.

Manno interviewed Smith. Soon into the interview Smith stated that he assumed Manno was there because of plaintiff. Smith described plaintiff as a problematic employee in that he was unreliable and could not work with others. Smith said no one in the office or field wanted to work with plaintiff. Plaintiff began to "ramp up" around the time he converted to Judaism employee. He explained that plaintiff's interactions with his coworkers had been deteriorating and often plaintiff just stared at his coworkers when they tried to converse with him. Smith assumed this behavior came from plaintiff perceiving his coworkers as "unclean" and thus unworthy of being fit for conversation. He also indicated plaintiff did not understand parts of his job and therefore everyone had to spend extra time when dealing with plaintiff.

Smith claimed he was "softer and more accommodating with plaintiff. For example, when Smith said "Hey, Good Morning Sunshine" to plaintiff a few days before, plaintiff just requested Smith not speak to him in that way. Smith likewise denied ever singing in the office,

but upon further questioning did concede that he had sung "Ryan, your so fine, you blow my mind" in the past, but only in a way that signified it was approving of plaintiff figuring out something important about the job – like the equivalent of saying "good job" or "you got it." Smith then said plaintiff could recall all of these specific incidents, but could not remember something he had just been taught the day before.

Smith indicated his response to learning plaintiff had taken up swing dance classes was completely complimentary and the Smith thought plaintiff doing so was cool. He explained that his wife liked to dance and she would love it if he learned to dance. He indicated that he went "full blown ballerina" with his arms up in the air when he found out and that plaintiff and the other office members just laughed when that happened. Smith admitted he had a bottle of scotch whiskey in his office but adamantly denied having consumed any of it while at work.

Smith further disclosed and then commented on the multiple emails received from plaintiff's coworkers in the later part of November. Smith disavowed any peculiarity about receiving them within 3 days of each other. He described calling plaintiff to his home to discuss them and telling plaintiff that his interactions with his coworkers had to improve or he would have to formally report plaintiff to HR. Smith further explained that he had received similar comments from plaintiff's coworkers in the past, but they had been verbal complaints, and he would then talk to plaintiff. Plaintiff's attitude would improve for a short time, but then plaintiff would revert back to ignoring people. He also would fail to retain training and repeatedly make the same mistakes.

Smith also criticized plaintiff "for bringing God into everything." He then acknowledged that as between himself and plaintiff there was a lot of discussion about religion in the workplace. Smith engaged in such discussions to "understand" what plaintiff was saying about

his religious beliefs and felt that plaintiff made people feel like their beliefs were not good enough. In response, Smith "told [plaintiff] multiple times that I believe in Jesus Christ and [plaintiff] is free to have his own beliefs." Smith did not report any of these discussions out of respect for the long-standing relationship between Smith and plaintiff going back to their days together in the Marines. Smith gave plaintiff multiple chances to change and "to do the right thing." Plaintiff never did change and at that point Smith had come to believe he wasn't going to change.

Smith further revealed that plaintiff had started backing away from him in recent times. In this regard plaintiff would go into his office and move his chair away from Smith. Smith indicated he though this behavior by plaintiff was "just weird."

Smith further admitted, after reflection, that he approached plaintiff with pliers in his hand. The conversation between the two was focused on religion and Smith walked toward plaintiff while clutching and clamping the pliers and said: "I will continue to believe in my Jesus Christ." Smith denied actually pulling plaintiff's hair at the time. Smith said plaintiff reacted by laughing.

Smith denied ever calling plaintiff a faggot. He admitted that he and plaintiff had conversations about religion all the time. And in hindsight those conversations had become a much bigger issue then he though or knew they were.

Smith recalled having a discussion about company shirts with plaintiff, but Smith only recalled that the box appeared to contain only size large. Smith recalled telling plaintiff to look through the box of shirts for a medium-sized shirt, and if there was one plaintiff could have it. According to Smith, plaintiff just staired at him when he said this.

Smith also recalled plaintiff requesting that Smith stop greeting him with "good morning sunshine" and Smith reported that he honored plaintiff's request. Smith indicated that plaintiff just ignored him for the most part and stared back at Smith. Smith indicated plaintiff "ignores most people though."

At the end of the interview Smith expressed concern about the ramifications it would have on him, asking in effect what this meant for him now. When asked to elaborate about his concerns, Smith told Manno:

> I see now that the issues I thought I had with Ryan [are] much bigger than I thought or knew they were. I wish I would have brought HR in sooner. I Just figured I could work this out myself with Ryan. We have history together – we were roommates in the marines. I thought I knew the guy. I guess not. When I realized how drastically his interactions were changing with the team, I should have told people, my boss, HR, but I really thought he would change and do the work. I never thought we'd be here now.

Manno also interviewed Saville, Cerro and Guaden. In general, these employees described a good working environment with the exception of interactions with plaintiff. They indicated plaintiff was not a team player and often failed to answer questions or generally ignored them in the office. Saville indicated she had "a great relationship" with the members of her team, with the exception of plaintiff who had made the office stressful. She referred to the others as "her guys" and indicated she was "happy to take care of them." Plaintiff, on the other hand, purportedly had "issues with authority" and invaded her personal space by standing over her while she was at her computer. She didn't feel safe around him. She described office skirmishes with him involving the situating of a desk for the new "safety guy," interaction concerning a "broken" keyboard on her desk, the replacement of a light bulb in the office and an effort to provide a vendor with customer support. Each incident had stood out in Saville's mind as creating an awkward situation and involving weird/odd behavior by plaintiff.

Cerno likewise indicated that plaintiff was a loner of sorts and had a way of making people in the workplace feel ignored. He often didn't engage in team functions and did not answer questions by co-workers. He recalled plaintiff making a comment that he was in a different place spiritually and if Cerno did not have the same beliefs, then plaintiff doesn't have to respect him in the same way. Cerno explained that he was in disbelief that plaintiff made such a statement. Somehow Cerno was able to discuss this conversation with Smith, who told plaintiff that although he was entitled to his beliefs, he still had to talk to his co-workers.

Cerno repeatedly asserted that everyone in the Export office got along with each other, with the exception of plaintiff, whom nobody had a good relationship. There were days when there would not be any interaction with plaintiff and it made everyone in the office feel uncomfortable.

Cerno praised Smith as a good office supervisor. He denied witnessing the various forms of harassing or intimidating behavior identified by plaintiff. He did highlight an incident where plaintiff had slapped Guaden on the shoulder as part of a greeting exchange, and it appeared to be a pretty forceful slap. Cerno also identified plaintiff's unwillingness to share an office with the new safety person and moving the desk out of his office as another situation that made everyone feel awkward. He also referenced the incident where plaintiff sat in his office with the lights turned off and Saville had to ask him to keep them on so she could get her work done.

On December 18, 2017, plaintiff reached out to Manno to report a disturbing incident. Plaintiff said everything had been fine around the office after the interviews and Smith seemed to be less intrusive with regard to his personal space. Nevertheless, Smith had grown increasingly critical of plaintiff's work, taking the opportunity to knit pick his work and point out any little mistake or deviation. On the day before, Smith came into question plaintiff about the process of

closing out purchase orders and grew increasingly hostile and intimidating as the discussion continued.  Smith was very short and continued to interrupt plaintiff.  Smith then stood up, took his jacket off, puffed out his chest and appeared to be posturing for a fight.  Plaintiff told Smith he was not afraid of him.  Smith reached below his desk as if he were reaching for a gun and said: "you need to be afraid of me; I'm evil [a]nd you need to be afraid of evil."  Plaintiff sensed a "murderous intent" coming out of Smith.

Manno asked if there had been any witnesses.  Plaintiff said possibly Saville, but she was in her office.  Manno simply thanked plaintiff for relaying the report.

Smith contacted Manno on December 19, 2017.  He stated that after the interviews plaintiff had been completely insubordinate to him.  He then described the interaction between the two of them on December 17, 2017.  He had grown frustrated during the exchange because plaintiff simply acted like he did not know why Smith was being critical of his work even though plaintiff  had been trained on the process several times.  Smith did acknowledge that plaintiff had been interacting better with the other office workers after the interviews and Manno encouraged Smith to praise plaintiff for that improvement.

Plaintiff is prepared to testify to additional details of the work environment that were not memorialized in Manno's written reports from the interviews.  After plaintiff initially became employed with defendant, Smith invited him over for dinner several times.  During these get togethers plaintiff confided in Smith about his recent past and why he had moved to Pennsylvania.  Plaintiff told Smith about his prior opiate addition (plaintiff's) and the severe addition that plagued his former wife.  Her addiction continued after plaintiff tried to get sober and became an impediment to plaintiff's rehabilitation and their marriage.  Plaintiff eventually

divorced his wife and decided to leave the area. He was anxious for a fresh start and a break from the past.

Plaintiff also confided in Smith about his search for a more meaningful life spiritually. This had led to his conversion to Judaism.

Smith reacted by disapproving of plaintiff's religious beliefs and began to proselytize about the superiority and dominance of Christianity. He made plaintiff feel as if his beliefs were inferior and inadequate and used religion to make plaintiff feel deeply guilty about divorcing his wife.

Smith's proselytizing in the workplace was ongoing. Plaintiff resisted and tried to stand up for his religious beliefs. Plaintiff would reiterate his belief that there was only "God" and the oneness of God. Smith would become increasingly hostile and try to assert dominance over plaintiff when and after these discussions occurred. Smith would make comments such as "the Jews learned their lesson during the Holocaust" and say things like "I'm going to put you in a box and ship you to Israel." He made other statements as well, such as "why don't you quit and go over to their side." On one occasion Smith mimicked a Nazi "goose step" march past plaintiff's office door.

Smith also used anti-Muslim rhetoric in the workplace in front of plaintiff and other co-workers. He would mock Muslims and call them ragheads. He would shout "Allah akbar" while sitting at his desk. He expressed the view that Muslims should be eliminated.

Smith also told plaintiff crazy stuff, like Smith's wife was in the KKK and his brother was a Nazi. He repeated these claims and eventually plaintiff began to believe the statements. He had no reason to disbelieve them.

Smith frequently ridiculed and mocked plaintiff about his behaviors that were not inline with the typical blue-collar male stereotype. He would greet plaintiff by saying "good morning sunshine" and sing to plaintiff in a mocking and demeaning way every morning for months. He would frequently call plaintiff a "faggot" and mimicked a pelvic thrust motion. He would comment to others while in plaintiff's presence that "people will want to cover their buttholes" when plaintiff came around. As a heterosexual individual, plaintiff was particularly offended and disturbed by this behavior and characterization.

Smith often mocked and belittled plaintiff in front of his co-workers. At times, Cerro, Gauden and Rishel joined Smith in jeering and making fun of plaintiff. Cerro joined in berating plaintiff to a degree that he was in effect an enforcer of Smith's treatment of plaintiff.

Smith had training in counterterrorism as part of his military training. Smith used tactics from this training to create a position of dominance over plaintiff. He would make a point of trying to be ever present in the unfolding of plaintiff's work and personal like. He would frequently "pop up" as plaintiff would come around a corner in the workplace and startle or scare plaintiff. He sought to create the impression that he was able to constantly watch plaintiff and keep track of his every action. He would make sure plaintiff knew that he was aware of the recent events and conversations on plaintiff's cellular telephone.

Smith followed and stalked plaintiff. At one point Smith even tailed plaintiff to and from a religious event. He invited himself to a Jewish service at the synagogue and then belittled and made fun of what he had observed there.

Smith frequently made statements to plaintiff that suggested Smith was a "Megalomaniac" and had grandiose powers. He would say he was God, write down "Elohim" and tell plaintiff he wanted plaintiff to fail at his job. When he would jump out and startle

plaintiff in the workplace, he would state to plaintiff that he was "Lucifer." He repeatedly told plaintiff that he was "CIA" and he said this so many times that plaintiff began to believe it.

Smith bragged to plaintiff about his ability to control other workers' advancement within defendant's operations. Smith claimed he was able to block the promotion of John Adams repeatedly and bragged to plaintiff about doing so all the time. He also bragged about holding Matt Rush back from advancing at the company. Smith thought this was amusing. Adams eventual ended his employment with defendant, and Smith's unorthodox treatment of plaintiff ratcheted up even further.

Smith convinced plaintiff that he had inside control over whatever the company did at the Export location. He indicated he was tight with and could control all the individuals in the chain of command. Plaintiff tried to transfer out of Export or to the safety department and beyond Smith's control, but he was unable to get away from Smith.

Plaintiff electronically verified that he had received a copy of defendant's employee handbook when he started his employment. Plaintiff did not read or review the handbook at that time. Defendant did not emphasize or require plaintiff to complete its anti-discrimination and anti-harassment training for over a year.

During the year that plaintiff worked without the benefit of training on defendant's workplace policies, plaintiff had the belief that any complaint about Smith's behavior and/or his treatment of plaintiff would simply end up being brought to Smith's attention. Thus, plaintiff believed there was really no one to complain to or confide in about Smith's ongoing harassment and telling anyone about Smith's behavior would just end up making Smith angry and things would become worse for plaintiff.

After months of having to endure Smith's mocking and belittling, plaintiff tried to separate himself from Smith as much as possible. He situated his desk so that Smith could not hover over him. He entered the office in a way that made it difficult for Smith to butt-slap plaintiff or touch him in queer ways. He tried to change his name to "Will" in the hopes of keeping Smith from engaging in the berating singing of plaintiff's name in the daily lyrics he used. He tried to refrain from expressing emotion or reacting to anything going on in the office.

Plaintiff adopted these sheltering tactics in the fall of 2017. These tactics seemed to be working for a few months. Plaintiff then watched the training on workplace discrimination and harassment on December 7, 2017, and immediately realized that he had been a victim of such behavior. He used defendant's Ethicspoint reporting system to lodge an "anonymous" complaint about Smith's behavior. Manno immediately came to Export and interviewed Smith. Smith thereafter scrutinized every aspect of plaintiff's work and began assigning belittling and degrading work to plaintiff. He searched for ways to make plaintiff's work more difficult and confusing. He often interacted with plaintiff in non-verbal ways which clearly were meant to convey contempt, anger and disapproval.

Plaintiff formed the belief the Manno could not control Smith or change his behavior towards plaintiff. Manno's interviewing had revealed that any complaint would be investigated in a manner that made clear the origins of the complaint. Even though Manno said she was not going to let things continue the way they were, Smith continued harassing plaintiff with a new level of intensity. When plaintiff reported the incident involving the simulation of drawing a gun, Manno merely thanked him for the information. She did not seem to believe plaintiff and asked if there were any witnesses.

After filing a complaint and reporting the subsequent threatening conduct by Smith, plaintiff believed he could not trust Manno. He began to question whether she was working with Smith to search for pretext to terminate him.

Plaintiff resigned from his position on December 29, 2017. He had already been in contact with his previous employer before he resigned. He moved back to North Carolina in January of 2018 and went back to work with his previous employer, Suddenlink.

On December 18, 2017, defendant prepared disciplinary action to be issued to Smith. The discipline actually was issued on January 2, 2018. Defendant emphasized the need to maintain professionalism in the workplace, exercising mindfulness in conversing and interacting with employees, being respectful of employees' personal space, focusing on work-related matters and avoiding any touching or physical contact. Further, any complaint about the work environment was to be reported to management. Defendant advised Smith that "[i]f these aspects of your performance do not improve or if your performance deteriorates in other areas, the Company will take further disciplinary action up to and including the termination of your employment."

Smith left his employment with defendant thereafter.

Defendant moves for summary judgment on several grounds. It contends that the Faragher-Ellerth doctrine precludes further proceedings on plaintiff's hostile work environment claims because defendant had an established workplace policy precluding discrimination, harassment and retaliation when plaintiff was hired, plaintiff did not invoke the protections in the policy for over a year, plaintiff's first complaint was investigated promptly and he resigned before defendant could determine whether appropriate corrective actions were warranted. Further, much of the conduct of which plaintiff now complains assertedly was not identified in

his initial report to defendant and what was reported cannot satisfy the prima facia elements of a hostile work environment claim because it was unrelated to religion or gender and did not rise to the level of the persistent and regular conduct needed to sustain such claims in any event. Plaintiff cannot establish a materially adverse employment action in order to proceed with his discrimination claims because defendant responded to plaintiff's report promptly, did not take any adverse employment action against him and plaintiff resigned before defendant took action with regard to what its investigation was able to verify. And the conditions in the workplace fail to rise to the level needed to support a constructive discharge. Finally, defendant maintains that plaintiff's claims of retaliation purportedly are deficient because plaintiff did not suffer any materially adverse employment action and there is no evidence to suggest defendant took action against plaintiff because he filed a report pursuant to defendant's workplace policies.

Plaintiff maintains that the record contains adequate evidence to support the findings needed to sustain his hostile work environment claims. In this regard, he assertedly was subjected to a highly offensive work environment and discriminatory treatment because his supervisor did not approve of his conversion to Judaism or his life-style choices that did not conform with the "macho" male traits typically espoused by the blue-collar and ex-military workers within the Export office. Further, defendant's lack of adequate training within the Export office in general and its failure to insist that plaintiff complete the available training for over a year preclude defendant's ability to avail itself of the Faragher-Ellerth defense. And while defendant did send Manno to investigate plaintiff's initial complaint, it failed to take any meaningful steps to control the environment or monitor Smith's behavior following plaintiff's complaint. As a result, the environment grew increasingly hostile as the days passed and Smith's treatment of plaintiff culminated in a threat of physical violence. Manno failed to provide any

indication that something would be done to rein in Smith's escalating treatment of plaintiff; instead, she implicitly questioned plaintiff's veracity, which in turn reasonably made him fear for his safety. In addition, she did not take any action to protect plaintiff from further harassment or retaliation. This state of affairs made resigning the only viable option and precludes defendant's ability to rely on the <u>Faragher-Ellerth</u> defense. In other words, plaintiff argues there is sufficient evidence to support his hostile environment, retaliation and constructive discharge claims and defendant's contentions to the contrary are unavailing.

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000 e–2(a)(1). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected employees] in employment." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998) (quoting <u>Meritor Savs. Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986)). "Title VII is violated 'when the workplace is permeated with discriminatory [gender-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Ocheltree v. Scollon Productions, Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 215 (1993)). Title VII is designed to protect against "working environments [that are] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." <u>Meritor</u>, 477 U.S. at 66 (quoting <u>Rodgers v. EEOC</u>, 454 F.2d 234, 238 (5th Cir. 1971)).

A plaintiff alleging a hostile work environment must establish the following elements: (1) the employee suffered intentional discrimination because of the protected trait (here religion and/or gender); (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same protected trait in that position; and (5) the existence of respondeat superior liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276–77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280–281.

In general, the Supreme Court's cases in the area have taken "a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21. Striking such a balance is necessary to maintain the distinction between objectively hostile or abusive work environments that violate Title VII's broad rule of workplace equality and simple teasing, offhand comments and isolated incidents that are beyond its reach. Id.; Clark County v. Breeden, 532 U.S. 268, 271 (2001). The Supreme Court has emphasized that the standards for judging hostility must remain sufficiently demanding so that Title VII does not become "a general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "The question of 'whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Moody v. Atlantic City Board of Educ., 870 F.3d 206, 214 (3d Cir. 2017) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)).

The workplace conduct underlying a harassment claim is not to be measured in isolation. Instead, it is to be assessed "by looking at all the circumstances." Clark County, 532 U.S. at 270. In analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." Abramson, 260 F.3d at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Defendant contends that plaintiff has failed to produce any evidence to establish the first element, *i.e.*, that he suffered discriminatory treatment because of his religion and/or gender. It asserts that when the incidents in the record are examined in context and considered in conjunction with the remaining evidence, the record fails to reflect any evidence of discriminatory treatment based on either of these protected traits. It highlights that plaintiff has merely complained about 1) having his name inserted into a song, 2) having his hair pulled with pliers, 3) having his buttocks smacked, 4) having a finger inserted into his ear, 5) being questioned about swing dancing, 6) being spoken to in a frightening manner, 7) being "flipped off" and witnessing the same treatment administered to others in the workplace, 8) witnessing the office supervisor thrust his pelvis around the office, and 9) witnessing the office supervisor drink from a bottle of liquor in his office. According to defendant, there is in sufficient evidence to establish that this conduct was specifically directed at plaintiff let alone adequate evidence to suggest that much of this conduct "was directed at [plaintiff]" because of his religion or gender.

Thus, it asserts that plaintiff's evidence falls short of demonstrating the presence of religiously-based and/or gender based animus. We disagree.

It is well-settled that a plaintiff need not produce direct evidence of an actor's motivation in order for conduct to be found to be discrimination. Abramson, 260 F.3d at 278. In this regard it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. Id. at 277-78. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to [his religion or gender]." Id. at 277. In this context a plaintiff is not "required . . . to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Id. at 278. Instead, the intent to discriminate can be inferred from the entire context in question and the conduct of the actors involved. Thus, "[r]egardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her 'work-place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and the conduct is based on one of the categories protected under Title VII, a hostile work environment claim will survive summary judgment." Id. at 278-79. In other words, "where . . . the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of [his religion and/or gender], the first prong of the prima facia case is met." Id. at 279.

In applying the above standards, the court disagrees with defendant's implicit contention that plaintiff is required to demonstrate that each of the incidents forming the basis of plaintiff's hostile work environment claim have a direct link to or create an inference of conduct motivated by religious-based and/or gender-based discriminatory animus. That is not the test which this

court must apply. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999) (district court appropriately refused to consider the defendant's attempt to disaggregate the various acts and endeavors forming the plaintiff's hostile work environment claim and cast doubt on each one, and properly evaluated the record as a whole). Instead, it must determine whether a reasonable factfinder could view the evidence as showing plaintiff's treatment was attributable to his religion and/or gender. And the evidence need not establish a direct intent to discriminate, but merely must be capable of proving that the conduct in question as a whole was directed toward the plaintiff because of his religion and/or gender. In making this evidentiary assessment, the court is not permitted to act as a factfinder and resolve the differing inferences that can be drawn from the evidence. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000). Instead, the evidence must be considered in the light most favorable to the non-movant, with all reasonable inferences being drawn in that party's favor. Id. When viewed as a whole, plaintiff has proffered sufficient evidence to support the first prong of a hostile work environment claim.

Defendant takes a sterile and cryptic view of what the record will permit the finder of fact to find, infer and conclude. The finder of fact may well find, infer and conclude that upon moving to Pennsylvania, plaintiff confided in Smith about his past, the reasons he left North Carolina and his recent search for spiritual fulfilment. Smith became critical of plaintiff's decision to divorce his wife and used plaintiff's religious beliefs to make plaintiff feel guilty about it. From that point forward, religious belief became a focal point of discussion between the two, which in turn spilled into their working relationship and the workplace. Smith lectured plaintiff about how offensive his divorce was to Smith's version of Christianity. He did this in front of other workers in the Export office, who then began to engage in the same sort of

behavior.  For example, Isaac Rishel told plaintiff in the workplace: "only Christians are going to be saved, you need to convert, end of days is coming."

Smith regularly proselytized to plaintiff and read biblical passages.  He often invaded plaintiff's personal space or physically cornered plaintiff while doing so.  On one occasion, Smith was lecturing plaintiff.  He then approached plaintiff with pliers in his hand and said: "as for me, I will continue to believe in my Jesus Christ."  He was clamping the pliers together as he did so and then he reached out and pulled a strand of plaintiff's hair out with the pliers.

Smith made many anti-Semitic statements to plaintiff.  These included: "Jews are the first terrorists;" "the Jewish people learned their lesson during the Holocaust;" and "my wife's family were Nazis."  Smith mimicked a Nazi "goose step" march past plaintiff's open office door and he threatened to put plaintiff in a box and ship him to Israel.

Smith continuously pressured plaintiff to take him to synagogue services.  After plaintiff failed to invite him, he tailed plaintiff and attended a service.  When plaintiff was leaving the service, Smith laughed at what he had observed and stated it was "feminine."

Smith was also critical and displayed distain for other religious beliefs as well.  He often expressed hatred for Muslins.  He called them ragheads in a mocking and belittling way.  He would shout "Allah akbar" while sitting at his desk for no apparent reason other than to mock the ritual.  And he espoused the view that all Muslins should be eliminated.

Smith's references to the Nazis and the Holocaust could be found to have conveyed a particularly repulsive and vile view of plaintiff's religious practices.  Symbols of and references to the Nazi regime carry a distinct connotation to individuals of the Jewish faith.  They reference a level of hatred and barbaric treatment that is unparalleled in world history.  Cf. Lake v. AK Steel Corp., 2:03cv517, 2006 WL 1158610, *26 (W.D. Pa. May 1, 2006) (Cercone, J.).  The

Nazi regime was founded on "a belief of Arian superiority and the need to brutally oppress any other race or ethnic group perceived as inferior." Id. For many, and particularly those of Jewish faith, reference to the regime in an approving or glorified manner carries an unmistakable inference of "oppression of those of Jewish heritage through genocide." Id.

And indeed, it is difficult to ascribe any meaning other than hatred and oppression to Smith's statements that the Jews were the first terrorists and the Jewish people learned their lesson in the Holocaust. And when coupled with Nazi rituals in the workplace such as goose step marching and reminders of his familiar descendants being directly from the regime, the finder of fat may well be convinced that much of the treatment was perpetrated by Smith to treat plaintiff in a manner designed to deter him from continuing to practice and subscribe to the tenants of Judaism.

Defendant's contention that Smith's treatment of plaintiff is insufficient to support a finding that it was on account of sex equally is misplaced. The seminal case regarding Title VII gender stereotyping claims is Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). There, through a plurality opinion, the Court recognized that evidence of an employer's gender stereotyping could be used to prove that a female employee was refused a promotion "because of" her "sex." Id. at 250–51. The Court opined that "[a]s for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for 'in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" Id. at 251 (quoting Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 707, n. 13 (1978)). Thus, "an

employer who acts on the basis or a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  Id. at 250.

Our Court of Appeals thereafter squarely has held that Title VII's "because of sex" language prohibits discrimination based upon an employer's subjectively held gender stereotypes.  Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, 286–87 (3d Cir. 2009).  This assessment is grounded in the increasingly broad view the United States Supreme Court has taken in construing Title VII's "because of sex" language.  See EEOC v. Scott Med. Health Ctr., 217 F.Supp.3d 834, 839 (W.D. Pa. 2016) (citing Price Waterhouse, 490 U.S. at  250 ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a women cannot be aggressive, or that she must not be, has acted on the basis of gender.")); Newport News Shipbuilding and Dry Dock Co. v. EEOC, 462 U.S. 669, 682 (1983) ("Male as well as female employees are protected against discrimination."); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986) ("[P]laintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment"); Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998) ("[W]e conclude that sex discrimination consisting of same-sex sexual harassment is actionable under Title VII.").

Other courts of appeals likewise have held that discriminatory treatment based on sexual stereotyping violates Title VII.  See e.g. Smith v. City of Salem, Ohio, 378 F.3d 566, 575 (6th Cir. 2004) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity."); Hively v. Ivy Tech Community College of Indiana, 853 F.3d 339, 345-46 (7th Cir. 2017) (en banc) (treatment by an employer

based on gender stereotyping violates Title VII because the employee's protected characteristic has played a role in the treatment).  And the Supreme Court recently made unequivocally clear that taking adverse employment action based on non-conforming traits or behaviors of an employee's gender falls within the core behavior prohibited by Title VII.  Bostock v. Clayton County, Georgia, -- U.S. --, 140 S. Ct. 1731, 1741 (2020) ("This statute works to protect individuals of both sexes from discrimination, and does so equally.  So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in both cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it.").

Plaintiff has advanced sufficient evidence to establish that he suffered harassment based on his non-conformity with Smith's perceived beliefs about the traits and mannerisms a male should possess and display in the workplace.  Smith and the other males in the office were stocky and muscle bound.  Plaintiff has a slender physique.  The others hunted, fished and drank beer as forms of relaxation.  Plaintiff practiced yoga on a daily basis, took swing dance lessons and ate a vegetarian diet.

Smith frequently greeted plaintiff by saying "good morning sunshine."  He inserted plaintiff's name in song lyrics and sang the lyrics in a belittling manner multiple times a day for months.  Smith went "totally full-blown ballerina" in an exaggerated dancing ritual when he learned that plaintiff was taking lessons in swing dancing.  Smith did not treat any of the other males in the office in a similar manner.

Each of the above patterns of behavior can be found to have meant to carry a disapproving connotation about plaintiff's non-conformity with Smith's version of the traits and

mannerisms that were expected of a male. The rituals with the song and greeting could be understood to have conveyed a mocking disapproval of effeminate characteristics displayed by plaintiff. The reaction to plaintiff taking lessons in swing dancing could be found to be particularly mocking with the intent to convey disapproval of the behavior.

Of course, Smith advanced alternative motives for his behavior to Manno. He claimed the song was done infrequently and only as a way of praising and rewarding plaintiff for succeeding in a task or with problem-solving. But over time plaintiff became so distraught by the treatment that he attempted to change his name just so Smith would stop singing to him in that manner. Whether the behavior was praise or calculated harassment designed to ridicule plaintiff for his lack of acting more like what was expected of a man in the Export office is a question that must be left to the finder of fact.

Smith advanced a similar explanation for his full-blown ballerina response. Smith suggested the response was designed to express his admiration for plaintiff learning to dance. Plaintiff described it as an exaggerated response undertaken with the intent to mock and belittle plaintiff in the office in front of his co-workers.

Context is of course quite important in a hostile work environment setting. As to all of these rituals, the greetings, the singing and the dancing, the natural inference about why one would engage in the behavior and what was intended to be conveyed to the observer is much more in line with plaintiff's account. Viewing the rituals as praise and approval is not something that would be a common reaction to the behavior as plaintiff has described it. In other words, while defendant can seek to convince the finder of fact that the behavior did not occur and/or Smith sought to convey other non-harassing sediments through these behaviors, the jury

certainly will have the prerogative to find that plaintiff's account is in accord with the preponderance of the evidence.

Moreover, Smith engaged in other behaviors that appeared to mock plaintiff for failing to display masculine traits. Plaintiff is heterosexual but Smith often ridiculed him for displaying traits that were different from Smith's version of masculinity. Smith often slapped plaintiff on the buttocks and would comment that "people will want to cover their buttholes when you come around." He pranced past plaintiff's office door while mimicking a pelvic thrust motion. He did this in the open office where others could observe the ritual. He repeatedly called plaintiff a faggot. And he made derisive comments about how good plaintiff's slender build would fit in a company T-shirt.

Again, defendant takes the position that these practices did not occur or, if they did, they occurred in a context and under circumstances that make them innocuous or mere office slights and vulgarities. Smith provided a different version of many of the behaviors and the jury might be persuaded that Smith's account is the more accurate portrayal. But the finder of fact may well credit plaintiff's account. Should it do so, it may likewise infer that these rituals and forms of ridicule were directly aimed at plaintiff because of plaintiff's non-conforming effeminate traits, characteristics and mannerisms. That is certainly the natural inference to be drawn from the butt slapping, calling plaintiff a faggot and the pelvis-thrusting past plaintiff's office door. And Smith's ongoing use of these behaviors would appear to smack of an intent to ridicule plaintiff because of his sex.

The record contains sufficient evidence from which the finder of fact may well conclude that Smith directed the rituals and behaviors and mocked plaintiff in order to express Smith's disapproval of plaintiff's religious beliefs. It likewise contains the same to support a finding that

Smith mocked and harassed plaintiff because of his sex. Thus, defendant's attempt to avoid liability as a matter of law on the first element of a hostile work environment claim is wide of the mark.

Defendant's contention that plaintiff lacks sufficient evidence to support a finding that the harassment was severe or pervasive equally is misplaced. In general, the Supreme Court's cases in this area have taken "a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21. Striking such a balance is necessary to maintain the distinction between objectively hostile or abusive work environments that violate Title VII's broad rule of workplace equality and simple teasing, offhand comments and isolated incidents that are beyond its reach. Id.; Clark County v. Breeden, 532 U.S. 268, 271 (2001).

The Supreme Court has emphasized that the standards for judging hostility must remain sufficiently demanding so that Title VII does not become "a general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). It has reiterated that "sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Clark County, 121 S.Ct. 1509; Meritor, 477 U.S. at 67. Conduct which amounts to the "ordinary tribulations of the workplace" such as sporadic use of abusive language, off-handed jokes and occasional taunting and teasing is beyond the purview of Title VII. Faragher, 524 U.S. at 788. Conduct becomes actionable only where it has become sufficiently "extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788.

All of the circumstances surrounding the asserted hostile conduct are to be examined in determining whether a work environment is sufficiently severe or pervasive. See Harris, 510

U.S. at 23.  The court should assess the objective severity of the harassment and can consider (1) its frequency, (2) its severity, (3) whether it is physically threatening or humiliating (as opposed to an offensive utterance), (4) whether it unreasonably interferes with the employee's work performance and (5) the effect on the employee's psychological well-being.  Id.; Moody v. Atlantic City Board of Educ., 870 F.3d 206, 214 (3d Cir. 2017)  ("The question of 'whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'") (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)).  It is the totality of the circumstances that is critical and no single factor is required or dispositive.  Faragher, 524 U.S. at 788.  As the Court has opined:

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts ... to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Oncale, 523 U.S. at 81-82; accord Abramson, 260 F.3d at 279-80 (pervasive requirement is satisfied where the evidence on the environment as a whole "can be found to aggregate to create an environment hostile to a person [sharing the plaintiff's protected trait].") (citing in support Durham Life Ins. Co., 166 F.3d 155).

Moreover, the severity of the asserted conduct must be considered.  Ordinarily, isolated incidents of offensive conduct do not rise to level of actionable conduct.  Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017) (citing Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)).  Nevertheless, the Supreme Court's precedent makes clear that "the correct standard is "severe or pervasive."  Id. (emphasis in original).  These are "alternative possibilities."  Id.  In

other words, "some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." Id. (quoting Jensen, 435 F.3d at 449 n. 3) Thus, isolated incidents or even a single incident of discriminatory treatment can satisfy the "severe or pervasive" requirement where the conduct is sufficient to amount to a change in the terms and conditions of employment. Id.

When considered under the above standards, plaintiff's evidence falls well above the threshold needed to proceed to trial. Plaintiff is prepared to testify that Smith taunted and mocked him almost daily. Probing and ridiculing about plaintiff about his practice of Judaism became a frequent topic. Smith used the tenants of Christianity to make plaintiff feel guilty about divorcing his wife. He regularly forced plaintiff into discussions about religion and proselytized to plaintiff. He mocked plaintiff in front of others by engaging in a goose step march while proceeding down the hall and past plaintiff's office door. He pulled plaintiff's hair out with pliers in an effort to emphasize the sincerity of his Christian-held beliefs. And he made quite concerning statements about the Jews being the first "terrorists," learning their "lesson" in the Holocaust and having family members who were "Nazis."

Smith also constantly chided, harassed and mocked plaintiff for failing to subscribe to and display what Smith perceived as the desired traits of masculinity. Smith regularly used greetings and sang songs which ridiculed plaintiff for displaying effeminate behavior. He often slapped plaintiff on the buttocks while making homophobic remarks. He would prance up the hall and past plaintiff's office while thrusting his pelvis as if to mock plaintiff for engaging in homosexual behaviors. He made derisive comments about plaintiff's slender build and belittled him for taking dancing lessons. He repeatedly ridiculed plaintiff by calling him a faggot and did so in front of the other office workers.

Taken as a whole, the harassment aimed at plaintiff because of his religion and sex was more than sufficient to meet the severe or persuasive element. Assuming the accuracy of plaintiff's account, a number of the behaviors were severe. And Smith made it a regular practice to ridicule and mock plaintiff in front of others. This behavior occurred to such a degree that plaintiff undertook somewhat unusual measures to stop the behavior, such as trying to change his name, entering the workplace and positioning himself differently and moving his desk. These measures may well be understood by the trier of fact to be reactions taken in desperation. Reading the record in the light most favorable to plaintiff, the finder of fact could conclude that the harassment was both severe and pervasive.

Defendant's efforts to foreclose plaintiff's harassment claim as a matter of law pursuant to the Faragher/Ellerth doctrine likewise fall short of the mark. "Employers may be liable for either a supervisor's or a co-worker's discriminatory acts." In re Tribune Media Co., 902 F.3d 384, 399 (3d Cir. 2018). When a hostile work environment is created by a non-supervising employee, such as a co-worker, then the employer is vicariously liable only if the employer was negligent in controlling working conditions. Vance v. Ball State Univ., 570 U.S. 421, 424 (2013); Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009). In general, "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston, 568 F.3d at 105. In this scenario, the employee has the burden of proving the negligence needed to establish vicarious liability. Ellerth, 524 U.S. at 767.

Where, however, a supervisor creates a hostile work environment, then a different set of rules apply. Vance, 570 U.S. at 424. In this scenario, an employer is strictly liable for a

supervisor's actions "[i]f the supervisor's harassment culminates in a tangible employment action." In re Tribune Media Co., 902 F.3d at 399 (quoting Vance, 570 U.S. at 424). A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassign[ing] with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 399–400 (citation and quotation marks omitted) (alteration in original). A supervisor under Title VII is an individual whom the employer has empowered to take tangible actions against the victim. Vance, 570 U.S. at 424.

Plaintiff asserts that because it is undisputed that Smith was a supervisor and the record shows that he perpetrated the harassment to the point where it culminated in a constructive discharge, the tangible employment requirement is satisfied and, therefore, the Faragher/Ellerth affirmative defense is unavailable. The difficulty with this position is that the Supreme Court directly considered this issue in Pennsylvania State Police v. Suders, 542 U.S. 129 (2004). There, the Court squarely held:

> To be sure, a constructive discharge is functionally the same as an actual termination in damages-enhancing respects. As the Third Circuit observed, both "en[d] the employer-employee relationship," and both "inflic[t] . . . direct economic harm." But when an official act does not underlie the constructive discharge, the Ellerth and Faragher analysis, we here hold, calls for extension of the affirmative defense to the employer.

Id. at 148 (citations omitted). Thus, plaintiff's assertion of a constructive discharge does not supply the tangible employment action needed to preclude defendant from pursuing its affirmative defense.

In contrast, where a supervisor creates a hostile work environment but has not taken tangible employment action against the employee as part of that environment, then the "employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff

unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  Vance, 570 U.S. at 424  (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765).  Vicarious liability may be imposed in such circumstances because, although less direct, the harasser is still "aided-in-the-accomplishment" of the harassment by the very nature of his or her position of authority over the employee.  Id. at 429-30.  In this regard, "a supervisor's power and authority invests his or her harassing conduct with a particularly threatening character, and in the sense, the supervisor is always aided by the agency relation."  Id. at 430.  Permitting the defendant to raise and prove the affirmative defense in this setting both accommodates the agency principles of vicarious liability and advances "Title VII's equally basic polices of encouraging forethought by employers and saving action by objecting employees."  Id. (citing Faragher, 524 U.S. at 803-5; Ellerth, 524 U.S. at 763).

        The "cornerstone" of an analysis assessing an employer's invocation of the Faragher/Ellerth defense is "reasonableness."  Minarshy v. Susquehanna County, 895 F.3d 303, 311 (3d Cir. 2018).  The first prong is focused on "the reasonableness of the employer's preventative and corrective measures," while the second is focused on "the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid harm."  Id.

        There is no question that the first prong of the defense places on a defendant the duty to "exercise reasonable care to prevent and correct promptly" any unlawful harassing behavior in the workplace.  Id. at 312.   And from the beginning, the Court made clear that "the existence of a functioning anti-harassment policy *could* prove the employer's exercise of reasonable care so as to satisfy the first element of the affirmative defense."  Id.  (emphasis in original) (citing Faragher, 524 U.S. at 807).  But maintaining a written anti-harassment policy and requiring a new employee to acknowledge having received and read the policy at the commencement of

employment does not mean that the inquiry on the first element is definitively satisfied in a defendant's favor. Id.; Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 118 (3d Cir. 1999) ("Ellerth and Faragher do not, as the defendants seem to assume, focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort."); Kanish v. Crawford Area Transportation Auth., 2021 WL 1520516, *6 (W.D. Pa. March 26, 2021) ("The mere existence of an anti-discrimination policy, however, does not establish that a defendant has met its burden for the first element of the defense.") (collecting cases). And this is so even though the policy provides multiple avenues to report harassing behavior. Minarsky, 895 F.3d at 312.

Instead, careful consideration of the entire constellation of circumstances must be undertaken in assessing whether there are material facts in dispute that can support a finding that the defendant put a policy in place that sufficiently was calculated to be effective and discharge its duty "to exercise reasonable care to prevent and correct promptly any [] harassing behavior." Id. at 313. For example, evidence from which the finder of fact could infer that harassment existed in the workplace and/or was continuing despite the existence of the adopted policy can have a meaningful bearing on whether the reasonable care standard has been met as a matter of law. Id. at 312-13; see also Tillison v. Capitol Bus Co., 2008 WL 2704536, *9 (M.D. Pa. July 8, 2008) (the lack of affirmative steps or training beyond the promulgation of an antiharassment policy coupled with the plaintiff's brief review of the policy at the time of hire created a material issue on whether the defendant acted reasonably as to the first element of the affirmative defense); Bennett v. Progressive Corp., 225 F. Supp.2d 190, 206-7 (N.D. N.Y. 2002) (the measures an employer has taken to disseminate a policy, its response to any inappropriate

behavior in the workplace, and the effectiveness of any such response are to be considered; issues of fact as to whether the employer's policy and actions are effectively remedial and promptly aimed at preventing and eliminating harassing behavior are within the province of the jury) (collecting cases).

Here, several aspects of the record preclude defendant's efforts to insulate from further consideration its undertakings seeking to establish the exercise of due care as a matter of law. First, as a new employee it is undisputed that in addition to reading and familiarizing himself with the employee handbook, plaintiff was to complete a training module familiarizing himself with prohibited workplace harassment and the avenues available to report the same. Plaintiff did not promptly complete a number of the new employee training modules, and this was brought to management's attention. Even then, it was over twelve months before plaintiff completed the workplace harassment training notwithstanding that it was required for new employees.

Second, Smith indicated that he had completed the very same training. In other words, the supervisor at the satellite Export office was familiar with the same anti-harassment policy and had underwent the same training.

Third, Smith engaged in the harassing behavior in the open office and at times in front of other employees. He made derisive comments about Jews and intimidating statements that appeared to validate the Nazi regime. He would goose step march down the hallway and proselytize about the superiority of Christianity. He made similar statements about plaintiff's physique and lack of machoism. He made derogatory statements about plaintiff's sexuality and portrayed him as a homosexual. He frequently criticized plaintiff about his lifestyle choices and mocked him about his choice of private activities such as swing dancing. And he did all of this

in front of other workers in and around the workplace, making it part of the Export office atmosphere.

Fourth, plaintiff identified at least three other employees who joined with Smith in perpetrating the harassment. These employees engaged in the same conduct and joined in Smith's efforts to promote Christianity and belittle plaintiff for not projecting a manly image in the workplace.

Fifth, there did not appear to be any other in-office individual tasked with monitoring the integrity of the work environment. The record suggest that defendant left this solely to one individual: Smith. This takes on added significance when the satellite nature of the Export office is taken into account.

This consultation of circumstances is enough to permit the finder of fact to pass on whether defendant met its burden of exercising reasonable care to prevent and correct promptly any harassing behavior. The inference is raised that defendant recognized at least the need for actual training on harassment for new employees. Yet it failed to assure that plaintiff had that training for over a year.

The inference also is raised that what training was supplied was insufficient to impress upon Smith the need to keep such discussions, ridicule and belittling behavior out of the workplace. It equally can be inferred that it was insufficient to impress upon the other office employees the need to do the same and/or to recognize the harm created from such a toxic environment.

Given the entirety of the record as read in the light most favorable to plaintiff and the numerous inferences about the shortcomings of defendant's efforts to prevent impermissible

harassment in the workplace in the first place, the issue of whether defendant "exercised reasonable care to prevent" unlawful behavior is one that must be reserved for the finder of fact.

Material issues of fact likewise abound about whether defendant's response to plaintiff's complaints of harassment constituted the exercise of reasonable care to correct promptly the reported harassing behavior.  To be sure, defendant's response consisted of Manno promptly coming up to the Export office and interviewing plaintiff, Smith and a few other office workers. At the conclusion of the first interview, Manno did nothing to insulate plaintiff from the supervision of Smith, even though the investigatory process laid bare exactly who had complained.  Nor was any other action taken.  The inference can be drawn that defendant was unwilling to credit plaintiff's account of Smith's behavior without independent corroboration from other individuals.  And this response was repeated after plaintiff reported the instance of a menacing threat from Smith.  Plaintiff was not separated from Smith's supervision, removed from the workplace or assured that his complaints would not subject him to further hostile treatment.  Indeed, Manno's reaction left plaintiff with the distinct impression that defendant did not believe him.

Defendant's response to plaintiff's reports must be assessed in part on the entirety of the record.  And the finder of fact will be free to take into account the behavior Smith did admit to during his interview with Manno.  These admissions tended to substantiate to a significant degree the foundations of plaintiff's initial report.  And they were deemed to carry the necessary implications needed for defendant to issue disciplinary action against Smith, albeit that the discipline was issued fourteen days after the second report and then only after plaintiff left his employment with defendant.

Given the entirety of the record as read in the light most favorable to plaintiff and the numerous inferences about the shortcomings of defendant's efforts to prevent impermissible harassment in the workplace in the first place, the issue of whether defendant "exercised reasonable care to . . . correct promptly" any unlawful behavior also is one that must be reserved for the finder of fact.

Defendant likewise has failed to demonstrate that the record can only support a finding that plaintiff unreasonably failed to take advantage of the actual preventive or corrective opportunities provided or to avoid harm otherwise. This element, and the concomitant inquiry, are "tied to the objective of Title VII, to avoid harm, rather than provide redress." Minarsky, 895 F.3d at 313. And as a general matter, a significant passage of time while the harassment is ongoing coupled with the employee's failure to take advantage of a well-implemented and effectively functioning anti-harassment policy will foreclose the employee's ability to defeat the employer's invocation of the Faragher/Ellerth defense. Id. (citing Jones v. Southeastern Pa. Transp. Auth., 796 F.3d 323, 329 (3d Cir. 2015) (employee's failure to report ongoing hostile work environment for over ten years and decision to do so only after she was written up for time-sheet fraud coupled with the undisputed fact that the employee had worked in the employer's office of civil rights, thus giving her knowledge of the existing anti-harassment policies and procedures, established the employee's failure to exercise reasonable care or otherwise avoid harm as a matter of law)). Nevertheless, workplace harassment is "highly circumstance-specific" and careful consideration must be given to the facts surrounding the employee's actions responsive to the harassment in order to assure that where appropriate, material issues about the reasonableness of those responses are left for the jury's consideration. Id. at 314.

There are several principles that guide the inquiry. First, while an employee's outright failure to report persistent harassment can be significant where effective opportunities are available to do so, the mere failure of an employee to report his or her harassment "is not *per se* unreasonable." Id. Second, "the passage of time is just one factor in the analysis." Id.

Moreover, the particular nature of the working relationship between the alleged victim and perpetrator must be examined. In this setting, evidence that a supervisor utilized his or her control over the work environment or took advantage of his or her vested authority to facilitate the harassment can provide meaningful insight into whether an employee's responsive reactions can be found to have been reasonable. Id. The supervisor's response to an employee's efforts to curb the offensive behaviors as well as any outside financial pressures that heighten any risk likely to be generated from an employee mounting further resistance and taking formal action also are not to be overlooked. Id. at 315.

If an employee asserts fear of retaliation as a basis for inaction in invoking the formal leavers of an anti-harassment policy, the surrounding circumstances must be examined to ferret out those situations where the fear could be determined to be well-founded and thus a reasonable response to a perplexing or complicated situation. Id. Of course, a generalized fear of retaliation "is insufficient to explain a long delay in reporting" harassment. Id. (collecting cases). But in contrast, fear of adverse action that is substantiated by record evidence can support a finding that the employee acted reasonably in not reporting the offending conduct. Specific record evidence bearing on any proclaimed fear of retaliation, whether from prior interactions between the employee and the supervisor or between other employees and the supervisor and/or upper management may be used to explain why an employee's inaction could be found to be reasonable under the circumstances. For example, if the supervisor instilled in the employee a belief of

mistrust of those who would consider and act on any report of misconduct, or if the supervisor had a track record of avoiding meaningful discipline for engaging in impermissible conduct, such evidence may well shed light on why a belief that availing oneself of the machinery behind an anti-harassment policy "would be futile, if not detrimental"  and thus capable of being found objectively reasonable under the circumstances.  Id. at 316.

Here, there is substantial record evidence which when construed in plaintiff's favor could support a finding that plaintiff's failure to invoke the machinery behind defendant's anti-harassment policy was not an unreasonable failure to take advantage of a preventive opportunity or to avoid harm otherwise.  First, defendant's basic evidence that plaintiff had an adequate understanding of defendant's preventive policies consists of his signing an acknowledgement of receiving and reading the employee handbook, which acknowledgement was obtained at the beginning of plaintiff's employment.  While defendant will be able to argue that the availability of the information on its anti-harassment policy within the handbook was enough to make plaintiff fully aware of the intricacies and nuances of how it was intended to be implemented and the protections it was intended to provide, the jury may find that at the time of hire plaintiff's concerns about being harassed were non-existent and his mere acknowledgement of receiving the handbook does not equate to a meaningful understanding of the policy's scope, operations and protections.  Compare Smokin' Joe's Tobacco Shop, 2007 WL 1258132, *7 ("While Smokin' Joe's had an anti-discrimination policy that was disseminated to employees in the employee handbook, this alone is not a basis for granting summary judgment to the defendant."); Tillison, 2008 WL 2704536, *9 (brief review of anti-harassment policy with employee on the first day of employment coupled with evidence suggesting little else was done in implementing the policy created a genuine issue of material fact on whether the defendant acted reasonably to prevent

harassment). Indeed, plaintiff claims he did not actually receive any specific details on defendant's anti-harassment policy prior to his December 7, 2017, training. And of course, the jury may bring their common experiences to bear regarding the starting of a new job after an interstate move in evaluating what a reasonable employee should be expected to retain from the initial presentation of such information in that manner. Such experiences might well lead them to conclude that plaintiff's failure to retain the scope of the policy's protections and/or the details of its procedures and protections was not unreasonable.

Moreover, defendant's policy of having new employees complete a training module on the anti-harassment policy, and thereby emphasizing and reinforcing the behaviors the policy sought to prevent and regulate, can and might well be viewed by the jury as supplying an important component of defendant's policy. After all, it was part of defendant's protocol to have new employees watch this training. And the moment plaintiff completed it, he utilized the mechanisms of the policy to register a complaint about Smith's behavior. The jury might well reason that defendant's efforts in assuring plaintiff timely complete this training were lax and, should they be persuaded that a sufficient amount of the behavior recounted by plaintiff did in fact occur, they could further find that defendant's lax approach in having plaintiff complete this training was a contributing factor in plaintiff not making management in Texas aware of Smith's offensive behavior at an earlier date.

Smith's control of the Export office and the power dynamic between plaintiff and Smith also can be found to have a bearing on plaintiff's delay in reporting Smith's conduct. Smith was in charge of the Export office and staff. Within the Export office, Smith did not answer to any other officer of defendant, presumably because no higher-ranking officer was present. Smith had direct control over plaintiff's working environment and working conditions. He directly

reviewed plaintiff's work and he oversaw and scrutinized plaintiff's interactions with other co-workers within this satellite office. This dominance over the day-today functioning of the Export office could well be viewed by the jury as a factor in evaluating the reasonableness of when and how plaintiff chose to respond to Smith's harassment.

Smith also led plaintiff to believe that Smith had significant influence over the entire workforce in the Export office. He repeatedly emphasized to plaintiff his ability to control the advancement of other employees working at the Export office. He reinforced the significance of this control by bragging that he was able to block advancements by Adams and Rush. Smith thought this was amusing and when Adams eventually left after failing to be advanced, Smith ratcheted up his offensive behavior toward plaintiff.

Smith's prominence in the office likewise could be found to have influenced the willingness of the other office workers to join in Smith's taunting and ridiculing plaintiff. Smith engaged in the harassing behavior in the office in front of plaintiff's co-workers and, if plaintiff is believed, at least three of those workers joined in ridiculing plaintiff over his Jewish beliefs and rituals and/or his effeminate traits.

The jury will be able to consider the power dynamic between Smith and plaintiff and the impressions Smith sought to instill regarding the same in evaluating plaintiff's responses to Smith's behavior. Assuming the jury credits plaintiff's account on this score, the jury could find plaintiff's beliefs that 1) any option to report Smith's behavior necessarily would proceed through Smith and 2) Smith had significant influence and control over how the company management in Texas would respond to any such efforts were reasonable. The jury likewise could find plaintiff's numerous attempts to deal with the harassment by utilizing ways to avoid Smith and eliminate the opportunities for Smith to engage in the behavior, such as changing the way he

came into the office in the morning, changing where his desk was positioned in the office, changing his name and attempting to transfer away from Smith's direct supervision, were reasonable attempts to deal with Smith's behavior and avoid further harassment in the workplace. Such a determination of reasonableness would only be bolstered if the jury credits plaintiff's account of the perceptions of control Smith instilled in plaintiff.

In short, the manner in which defendant administered its anti-harassment policy in the Export office in general and as to plaintiff in particular, its lax approach in assuring plaintiff completed the required anti-harassment training for new employees, Smith's unilateral control of the Export office, the power dynamic between plaintiff and Smith, and the beliefs and perceptions Smith sought to instill in plaintiff regarding Smith's influence over Export employees' advancement with defendant provide sufficient grounds for the jury to conclude that plaintiff's failure to invoke the machinery behind defendant's anti-harassment policy was not an unreasonable failure to take advantage of a preventive opportunity or to avoid harm otherwise. In other words, defendant has failed to show that the record only can be read as demonstrating that plaintiff failed to exercise reasonable care to avoid the harassment perpetrated by Smith or to protect himself from harm otherwise. Consequently, the record presents material issues of fact on the second element of defendant's affirmative defense as well.

Plaintiff's claim for constructive discharge also survives defendant's motion for summary judgment. To sustain a constructive discharge claim, a plaintiff must present evidence from which the finder of fact can conclude "that the working environment became so intolerable that [plaintiff's] resignation qualified as a fitting response." Pennsylvania State Police v. Sunders, 542 U.S. 129, 134 (2004). In other words, in addition to proving all of the elements for recovery on a claim for hostile work environment, plaintiff also must convince the jury that his "working

conditions [became] so intolerable that a reasonable person would have felt compelled to resign." Id. at 147.

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Hill v. Borough of Kutztown, 455 F.3d 225, 233 n.7 (quoting Pennsylvania State Police, 542 U.S. at 141). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Id. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S.17, 23 (1993). Of course, the analysis also focuses on the "totality of the circumstances," as no one factor is determinative. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).

Defendant maintains that the record fails to contain evidence to establish that plaintiff's working conditions became sufficiently intolerable. In this regard, it highlights the fact that plaintiff was not subjected to an adverse employment action, Manno investigated plaintiff's initial allegations and plaintiff reported that things had "been fine actually" and "everyone seemed to be getting along" prior to making his second report and plaintiff was in contact with his former employer prior to resigning. And it highlights unreported cases to support its construction that plaintiff has shown nothing more than isolated incidents of workplace unpleasantries and merely developed a subjective belief that his workplace had become stressful and frustrating. While defendant will be free to convince the jury that this was the actual state of affairs when plaintiff tendered his resignation, the record contains sufficient evidence to support

a finding that a reasonable person would have been compelled to resign due to the existence of intolerable working conditions.

In addition to all of the events forming the foundation of plaintiff's claim of hostile work environment, plaintiff is prepared to testify that after Manno came to the Export office and interviewed Smith and the other office workers, it was readily apparent to everyone that plaintiff had filed a complaint. Other than interviewing these alleged participants/witnesses, Manno did nothing to protect plaintiff from Smith or the other workers' ire. Smith responded by becoming hypercritical of plaintiff's work and giving him demeaning and confusing tasks. His escalating criticism about work tasks and demeaning review of plaintiff's efforts increased to the point where plaintiff felt he had no choice but to confront Smith. When he did so, he told Smith that he wasn't afraid of him. Smith responded by gesturing as if he were pulling a gun and told plaintiff that he, Smith, was evil and plaintiff needed to be afraid of evil. Plaintiff understood this gesture and response as a real threat to his physical wellbeing. He believed Smith was saying that he could in fact shoot plaintiff.

Plaintiff once again reported Smith's conduct to Manno. In doing so he told Manno that Smith had gestured at him as if he wanted to start a fight and reached below his desk and gestured as if he were pulling a gun. Manno simply thanked plaintiff for relaying the information and asked if there were any witnesses. She offered no other information to assure plaintiff that his response was being taken seriously and/or that measures to protect him from Smith would be forthcoming. Manno spoke to Smith by telephone after receiving plaintiff's December 18, 2017, report. She also notified defendant's legal department regarding the same. Manno could not recall if she even referenced the "threatening" gesture by Smith when she spoke to him or notified the legal department.

Manno's immediate response to plaintiff was to ask if there were any witnesses.  This and her failure to implement any meaningful response to plaintiff's report of Smith's threatening gesture suggested to plaintiff and reinforced his belief that Smith really did have the control and persuasion he claimed to possess with regard to defendant's upper management personnel.  These events made plaintiff become very edgy, apprehensive and fearful.

Plaintiff confided in his therapist about these recent events and discussed various options for preserving his mental wellbeing.  He then proffered his "resignation" on December 29, 2017.  Defendant prepared disciplinary action after plaintiff's December 18, 2017, report and thereafter implemented the discipline against Smith on January 2, 2018.

Defendant did not make anyone at the Export office aware that it was intending to take disciplinary action against Smith.  It issued the discipline only after plaintiff indicated he was "in fear for [his] life" and resigned.

Should the jury credit plaintiff's version of these events, it may well infer that Manno displayed a callous attitude of disbelief to plaintiff's report of threatening conduct.  The jury also will be free to credit plaintiff's account that Smith actually did gesture in a menacing way that indicated he could shoot plaintiff and did so with the intent to place plaintiff in genuine fear for his physical safety.  Given that the jury could find that the hostility between Smith and plaintiff escalated in less than eleven days after plaintiff made his first report, the harassment became focused on plaintiff's job performance and Smith became increasingly hypercritical of plaintiff's work, Smith began giving plaintiff demeaning and confusing tasks which could be viewed as an attempt to establish a pretext for failure, and Smith threatened plaintiff in a menacing way that implied his physical safety was at risk, the jury may well be convinced that 1) the frequency of the harassment escalated, 2) it increased to the point of a threat of severe bodily harm, 3) plaintiff

subjectively believed his safety was a risk, and 4) Smith's harassing interactions with plaintiff had reached a point where they were extracting a tremendous cost in plaintiff's work performance.  And the jury may well conclude that these events and the lack of any meaningful support from defendant's management personnel on or within the days after plaintiff made the reports, when coupled with the nature and history of Smith and plaintiff's interactions up until that point, would lead a reasonable employee in plaintiff's position objectively to believe that resigning was the only "fitting response" to the situation.

Defendant's efforts to gain summary judgment on plaintiff's claim of retaliation fail for the same reasons.  A prima facie case of retaliation requires a plaintiff to proffer evidence demonstrating that "(1) she engaged in protected conduct; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was 'materially adverse'; and (4) there was a causal connection between her participation in the protected activity and the adverse employment action." Hare v. Potter, 220 F. App'x 120, 127 (3d Cir. 2007).  The parties do not dispute that a claim of retaliation is to be analyzed at summary judgment under the well-established McDonnell-Douglas/Burdine tripartite paradigm.

In Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006), the Supreme Court clarified that the anti-retaliation provision is not limited to "workplace-related or employment-related retaliatory acts and harm."  Furthermore, it is not to be construed as "forbidding the same conduct prohibited by the antidiscrimination provision." Id.  Instead, retaliatory actions can be found to be "materially adverse" if they would have the effect of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68 (what is materially adverse "often depends on a constellation of

surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed").

Defendant maintains that a form of adverse employment action is needed to sustain such a claim and a voluntary resignation does not suffice.  It also asserts that plaintiff's evidence fails to establish a causal connection between his complaints about Smith and plaintiff's resignation. Plaintiff asserts that Smith escalating scrutiny and harassment within six days after Manno's interviews revealed that plaintiff had filed a complaint against Smith provides sufficient evidence of both the adverse action requirement and the requisite causal connection.

Defendant's contention that plaintiff has failed to identify any adverse action misses the forest for the trees.  It has long been settled that "a plaintiff who voluntarily resigned may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge." Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1075 (3d Cir. 1996) (*en banc*) (citing Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992)).  And while defendant will be free to argue that plaintiff's reports did not reflect the atmosphere of plaintiff's work environment at the Export office, the record contains sufficient evidence to submit the question of whether the failure to take any action immediately after plaintiff's first and second reports amounted to defendant knowingly permitting "conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Aman, 85 F.3d at 1084 (quoting Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984)).

It likewise is well established that  "a constructive discharge qualifies as adverse employment action in the sense that it is the legal equivalent to actual termination." Price v. Delaware Dept. of Correction, 40 F. Supp.2d 544, 553 (D. Del. 1999) (citing Jordan v. Clark,

847 F.2d 1368, 1377 n. 10 (9th Cir.1988) (citing 3 A. Larson & L. Larson, Employment, Discrimination, § 87.20 at 17–102 to 17–105 (1987)); accord Ellingsworth v. Hartford Fire Ins. Co., 247 F. Supp.3d 546, 556 (E.D. Pa. 2017) ("A constructive discharge constitutes an 'adverse employment action' for purposes of Title VII - if proven, it is the legal equivalent of being terminated."); Clegg v. Falcon Plastics, Inc., 174 F. App'x 18, 27 (3d Cir. 2006) ("A constructive discharge can count as an adverse employment action for retaliation purposes.") (citing Durham Life Ins. Co. v. Evans, 166 F.3d 139, 156 & n. 11 (3d Cir. 1999)). In other words, if the plaintiff establishes that he or she has been constructively discharged, the discharge is a sufficient showing of an "adverse action" needed to pursue a claim for retaliation. Clegg, 174 F. App'x at 27; Ellingsworth, 247 F. Supp.3d at 556; Price, 40 F. Supp.2d at 553; Lombard v. New Jersey Dep. of Trans., 2018 WL 5617553, *7-8 (D. N.J. Oct. 20, 2018) (constructive discharge establishes adverse action for claim of retaliation). And this principle has been recognized by a number of the courts of appeals as well. See, e.g., Jackman v. Fifth Judicial Dist. Dept. of Corrections Services, 728 F.3d 800, 804 (8th Cir. 2013) ("An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge.") (citing Wilkie v. Dep't of Health and Human Servs., 638 F.3d 944, 955 (8th Cir. 2011)); Quinn v. St Louis County, 653 F.3d 745, 751 (8th Cir. 2011) ("Similarly, the materially adverse employment action element may be met by a series of acts by the employer that, considered collectively, amount to constructive discharge.") (citing Helton v. Southland Racing Corp., 600 F.3d 954, 961 (8th Cir. 2010)); Williams v. Bristol-Myers Squibb, 85 F.3d

51

270, 274 7th Cir. 1996) (an established constructive discharge "would obviously be a materially adverse employment action.").

As noted above, the record contains sufficient evidence from which the jury may find each of the elements needed to establish liability on plaintiff's claim for hostile work environment. It likewise contains sufficient facts to support a finding that after being informed of the harassment, defendant failed to take affirmative steps to promptly correct and eliminate the harassment or do anything to remove plaintiff from Smith's supervision or otherwise assure that plaintiff would not be subjected to further adverse treatment or retaliation. And the relationship culminated in Smith subjecting plaintiff to a menacing threat of being physically harmed with a firearm. If the jury credits plaintiff's version of events, it will in effect have found an adverse employment action in the form of a constructive discharge. Cf. Williams, 85 F.3d at 274 ("If your supervisor tells you that he'll shoot you unless you resign 'voluntarily,' and you do, that's constructive discharge, though the threat itself is not an employment action of any sort.") (Posner, J.); Chapin v. Fort-Rohr Motors, 621 F.3d 673, 679 (7th Cir. 2010) ("For example, we have found constructive discharge when there is a threat to a plaintiff's personal safety.") (collecting cases); Munday v. Waste Management of North America,, Inc., 126 F.3d 239, 243 (4th Cir. 1997) ("Constructive discharge may be an adverse employment action in violation of § 20003e–3(a) 'when the record discloses that it was in retaliation for the employee's exercise of rights protected by the Act.'") (quoting Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir. 1984), cert. denied, 470 U.S. 1028 (1985)). Consequently, defendant's contention that the record fails to provide sufficient evidence on the "adverse action" needed for a retaliation claim is specious.

Plaintiff has provided sufficient evidence to submit the causation element to the jury as well.  In this regard, the record must contain sufficient evidence from which the finder of fact can link the materially adverse action to retaliatory animus.  <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 346 93d Cir. 2006).  Two central factors are brought into play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any "pattern of antagonism in the intervening period."  <u>Jensen v. Potter</u>, 435 F.3d 444, 450 (3d Cir. 2006) (quoting <u>Abramson</u>, 260 F.3d at 288 (quoting <u>Woodson</u>, 109 F.3d at 920-21)).  However, "[t]hese are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference."  <u>Id</u>. (quoting <u>Farrell</u>, 206 F.3d at 280 and citing in support <u>Kachmar v. SunGard Data Systems, Inc.</u>, 109 F.3d 173, 178 (3d Cir. 1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context specific.").

Where there is a temporal proximity between the protected activity and the adverse employment action, the requisite causal link may be inferred by the finder of fact.  <u>Woodson</u>, 109 F.3d at 920.  This is appropriate where the temporal relationship is sufficiently suggestive. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279 80 (3d Cir. 2000) (under certain circumstances temporal proximity alone can be sufficient to establish an inference of causation); <u>Krouse</u>, 126 F.3d at 503 (same); <u>accord</u> <u>Jensen</u>, 435 F.3d at 450 ("Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive.").  "But even if temporal proximity . . . is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus."  <u>Woodson</u>., 109 F.3d at 920 (quoting <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir.1997)).

Where the temporal relationship is attenuated, a "time plus" other evidence is required. Farrell, 206 F.3d at 280. This "other" evidence may, but need not, take the form of an intervening pattern of antagonism or other evidence of retaliatory animus. Id. at 281. Proffering sufficient proof is not limited, however, to timing and demonstrative proof alone; instead, this element may be satisfied by "other evidence gleaned from the record as a whole from which causation can be inferred." Id.

Here, the timing of the adverse action is sufficiently suggestive. Plaintiff has posited evidence to support findings that in the first few days after Manno's interviews in the Export office, Smith had been calm and things were fine. But then Smith became increasingly hypercritical of plaintiff's work and gave him demeaning and confusing tasks. His antagonism toward plaintiff escalated to the point where plaintiff sincerely believed he had no choice but to confront Smith. When he did so, Smith responded by gesturing as if he were pulling a gun and in effect threatened plaintiff with being shot. Plaintiff understood the gesture as a real threat to his physical wellbeing. He believed Smith was saying that he could in fact shoot plaintiff. Given the relationship between Smith and plaintiff and Smith's background and ongoing behavior in the workplace, a jury may well find that plaintiff's beliefs were objectively justified and thus, there was a causal connection between plaintiff's reports of hostile treatment and Smith's retaliatory treatment and menacing threat.

Moreover, defendant took no action to protect plaintiff from Smith's harassment or provide protective measures from the potential for retaliation. It did not inform plaintiff of any contemplated discipline against Smith or otherwise provide plaintiff with any understanding that he would be protected from such treatment after having invoked defendant's antiharassment policy. Plaintiff reported an increase in scrutiny and hostility within eleven days of making his

first report. He further reported that the hostility culminated in a menacing threat of bodily injury just six days after Manno completed the Export office interviews. Plaintiff's "constructive discharge" occurred eleven days after the second report.

The timing and nature of an employer's remedial actions are matters for the jury where there are material issues of fact about the promptness and effectiveness of such actions. Andreolli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007). Further, a plaintiff is not required to prove that defendant intentionally permitted an environment to grow in hostility to the point where the plaintiff's resignation was justified. The plaintiff only is required to prove that the defendant knowingly permitted an environment to progress to that level. See Goss, 747 F.2d at 888 ("We hold that no finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."). Given the constellation of circumstances presented, the finder of fact may be satisfied that the causation element for plaintiff's retaliation claim has been proven by a preponderance of the evidence.

Finally, defendant moves for summary judgment on plaintiff's claims for "gender discrimination" and "religious discrimination" on the ground that he has not proffered evidence sufficient to establish an adverse employment action and therefore cannot pursue claims for actionable instances of unlawful discrimination. Plaintiff has not mounted a response to defendant's motion as it relates to these claims beyond his response in support of his hostile work environment and concomitant constructive discharge claim(s). Nevertheless, a review of the First Amended Complaint indicates that these counts (counts VII through X) seek only to place defendant on notice that plaintiff is pursuing a claim for constructive discharge based on the

culmination of the work environment plaintiff allegedly was forced to endure. Consequently, defendant's motion will be denied on these claims as well.

For the reasons set forth above, defendant's motion for summary judgment will be denied. An appropriate order will follow.

Date: September 29, 2022

s/David Stewart Cercone<br>
David Stewart Cercone<br>
Senior United States District Judge

cc:    Andrew J. Horowitz, Esquire
       Bruce C. Fox, Esquire
       Tiffany A. Jenca, Esquire
       Daniel V. Johns, Esquire